**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**RODNEY HUPP,**                                   **CASE NO. 5:21-CV-00968**

                               **Plaintiff,**

        **-vs-**                                   **JUDGE PAMELA A. BARKER**

**CSX TRANSPORTATION, INC.,**

                               **Defendant.**      **MEMORANDUM    OPINION    AND
                                                   ORDER**

Currently pending is Defendant CSX Transportation, Inc.'s Motion for Summary Judgment.
(Doc. No. 19.)  Plaintiff Rodney Hupp filed an Opposition to CSX's Motion on March 10, 2023, to
which CSX replied on April 14, 2023.  (Doc. Nos. 23, 25.)  For the following reasons, Defendant's
Motion is GRANTED IN PART and DENIED IN PART.

**I.      Background**

        **A.      May 31, 2018 Incident**

Around 11 p.m. on May 30, 2018, Plaintiff Rodney Hupp, a train conductor for CSX, and
another CSX employee, the engineer, Chris Conti, assembled their train in New Castle, Pennsylvania
and were tasked with driving their train to Willard, Ohio.  (Hupp Depo., Doc. No. 23-2, PageID#
224-25, 248.)  During their run, Hupp was seated in the conductor's seat, which is positioned on the
left side of the locomotive cab.  (*Id.*)  Conti was seated in the engineer's seat, which is positioned on
the right side of the cab.  (*Id.*)

According to Hupp, during the ride, "the air [conditioner] was on the whole way up," and as
a result, it "was freezing in the cab."  (*Id.* at PageID# 228.)  Conti remarked that he "was freezing"

and opened the engineer's side (i.e., the right side) window to allow outside air in to warm up the cab.  (*Id.* at PageID# 229-30.)  According to Hupp, it was a "regular occurrence" to open the side window.  (*Id.*)  He testified that the cab is "a small space and just the way it is designed, it's either you're going to deal with the condensation of having the fan on or you're going to have it eventually at some point most people . . . [would] say it's freezing in there and that's how the engineers do it, they'll open their window."  (*Id.* at PageID# 228-29.)

In Hupp's supplemental affidavit, Hupp further clarifies the relationship between the cab's HVAC system, the fan, and the potential for condensation to form on the cab windows.  (Hupp Affid., Doc. No. 23-3.)  Hupp avers that it was "freezing" in the locomotive cab that night because the cab's air conditioner was turned on and "it was extremely cold due to the lack of ability to control the temperature."  (*Id.* at ¶ 7.)  Hupp avers that although the locomotives have fan settings on the HVAC units, using the fan "causes condensation to form on the windshield and on the windows[,] making it difficult to see and dangerous . . . . " (*Id.*)  Hupp avers that the "only remedy to this issue is to open the window."  (*Id.*)  Hupp maintains that it was for those reasons that the cab window was open on May 31, 2018.  (*Id.*)

On May 31, 2018 at 1:01 a.m., as the train passed through Cuyahoga Falls, Ohio, an object passed through the cab's open right-side window and struck Hupp in the right temple.  (Doc. No. 23-2, PageID# 242-44; *see also* CSX Incident Report, Doc. No. 19-2, PageID# 141.)  Conti stopped the train and Hupp sought medical treatment at Akron City Hospital.  (Doc. No. 19-2, PageID# 143-44.)  It was determined that Hupp was struck with a BB that became stuck in Hupp's right temple.  (*Id.* at PageID# 145.)  Doctors did not try to remove it at the time but gave Hupp a tetanus shot and released him from the emergency room without further incident.  (*Id.*)  According to Hupp, until the BB

2

incident, it had been a typical run and normal night, and Hupp did not observe anything out of the ordinary. (Doc. No. 23-2, PageID# 226, 232, 236.) He testified that he did not see anyone or anything on or near the tracks before the incident. (*Id.* at PageID# 232.) Though CSX and local police departments investigated the incident, no perpetrator was ever identified. (Doc. No. 19-2, PageID# 145.)

### B.  Hupp's Expert Report

In opposition to CSX's Motion, Hupp submitted an expert report from Richard F. Thomas, Sr., ("Thomas") a practicing railroad safety consultant with 43 years of railroad industry experience. (*See* Thomas Report, Doc. No. 23-4, PageID# 261.) In his report, Thomas opined as follows:

> Over the years, FRA has been very interested in cab temperature to the point of changing cab temperature from 50 degrees to 60 degree[s] minimum currently. Regulations have also been updated to include re-manufactured locomotives and new locomotives be equipped with operating air conditioning and periodic maintenance be performed under 49 CFR 229.119(g) and 49 CFR 229(h)[ ]to ensure the air conditioner operates as the manufacturer intended. A[n] improperly operating air condition causes safety issues under 49 CFR 229.45, General Safety Conditions, for the crew. Operating a locomotive in a[n] extremely cold or hot cab where the temperatures can reach 100+ degrees is dangerous. **The possibility of window condensation from the cab being too cold has occurred while I observed some runs in the past.** This often happens in locomotives with older air conditioning units with little or no control over locomotive cab interior temperature. **The condensation on windows requires the engineer or conductor to constantly clear the windows with paper towels or open windows to lower the temperature in the cab.** This takes the engineer's attention away from his job of running the locomotive safely and possibly missing crucial signals he needs to pay attention to operate the train safely.

(*Id.*, emphasis added.)

Thomas further noted that he had "not received any information or records to review that show CSX inspected BNSF 6769 [the locomotive that Hupp was operating at the time of his injury] for a properly operating air conditioning unit." (*Id.*) Thomas also noted that he "was not furnished with any information as to who the manufacturer of the air conditioning (AC) unit is, and CSX has

not indicated if the locomotive was inspected for proper AC operation post[-]accident." (*Id.*) Thomas believes that Hupp "was denied a proper mechanical inspection of the AC unit by CSX." (*Id.*)

Thomas further opined that "if the AC unit in the cab of BNSF 6769 was operating as the manufacturer intended, it would not have been necessary to attempt to regulate the cab temperature to a safe and comfortable environment by opening and closing the side windows of the BNSF 6769. The side windows of all locomotives are required to be of FRA Type II and are bullet proof when passed testing [*sic*] contained in 49 CFR 223." (*Id.* at PageID# 266.)

### C. CSX's Expert Report

To "avoid waiving the introduction of a countervailing report," CSX attached to its Reply an expert report by Foster J. Peterson ("Peterson") of Engineering Systems, Inc. ("ESi") on the "functioning of the HVAC system in the cab in question, the applicable statutory schem[e], and the compliance of the locomotive in question with the governing rules and regulations." (*See* Peterson ESi Report, Doc. No. 25-1.)

Peterson opined that Hupp offered "no actual basis to support the claim that BNSF 6769's HVAC system failed to operate as intended." (*Id.* at PgaeID# 288.) Peterson opined that in his experience with GE-manufactured locomotives like the ES44 or ES44C4 models, such locomotives do not have an HVAC thermostat control, "but rather an 8-position switch to control Fan, Heat, and Cool settings." (*Id.*) Peterson noted that GE's "typical" explanation of the HVAC controls includes a note that the "HVAC also de-mists the windshields," which Peterson claims "contradicts Plaintiff's allegation that using the fan by itself causes condensation to form on the windshield and windows." (*Id.* at PageID# 289.) Peterson notes that Hupp did not offer any evidence in his deposition testimony or affidavit that the crew attempted to use the "Low Cool" instead of the "High Cool" setting to

4

moderate the amount of cooling generated, that the fresh air damper was opened, that the crew tried the "low" or "high" fan settings, or that any condensation formed.  (*Id.*)

Peterson also opined that the "air conditioning being too cold for the crew's preference does not endanger the safety of the crew and is not a defect under Part 229," the relevant federal regulations.  (*Id.* at PageID# 290.)  Peterson also opined that "[t]here is also no reason why the locomotive cannot be operated with the cab window(s) open, and some crew members prefer to open the windows for fresh air."  (*Id.*)

Peterson also opined as follows:

> The fact that Plaintiff claims the air conditioning was too cold indicates that the HVAC system was working and capable of producing cool air. **BNSF maintenance records produced for BNSF 6769 indicate that CSX informed BNSF on May 31 that the air conditioner was "inoperative" and that there was "No Cooling", inconsistent with Mr. Hupp's claims as to the status of the HVAC system** (that it effectively worked too well). BNSF's records indicate the air conditioning was addressed in BNSF's Havre, Montana, shop on August 17, 2018, before the next periodic inspection which was conducted on September 12, 2018, in Los Angeles, California. This action complied with the regulatory requirements of 49 CFR 229.119 and the periodic inspection requirements of 229.23 and 229.25.

(*Id.*, emphasis added.)

Peterson concluded by opining that Conti "chose to open his window while operating Train Q27729 on May 30-31, 2018, which was allowable under the CSX operating and safety rules" and that Hupp "was not injured due to the condition of the locomotive or the fact that the cab window was open."  (*Id.* at PageID# 292.)

### D.   Procedural History

On May 10, 2021, Rodney Hupp filed his Complaint in this Court.  (Doc. No. 1.)  Therein, Hupp asserts two claims against CSX: Count I – Violation of the FELA – Negligence; and Count II – Negligence *per se* – Violation of Locomotive Inspection Act.  (*Id.*)  On October 10, 2022, CSX

5

filed the instant Motion for Summary Judgment.  (Doc. No. 19.)  Hupp filed an Opposition to CSX's Motion on March 10, 2023, to which CSX replied on April 14, 2023.  (Doc. Nos. 23, 25.)  Thus, CSX's Motion is now ripe for a decision.

## II.  Standard of Review

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A dispute is 'genuine' only if based on evidence upon which a reasonable jury could return a verdict in favor of the non-moving party."  *Henderson v. Walled Lake Consol. Sch.*, 469 F.3d 479, 487 (6th Cir. 2006).  A fact is "material" only "if its resolution might affect the outcome of the suit under the governing substantive law."  *Henderson*, 469 F.3d at 487.

At the summary judgment stage, "[a] court should view the facts and draw all reasonable inferences in favor of the non-moving party."  *Pittman v. Experian Info. Solutions, Inc.*, 901 F.3d 619, 628 (6th Cir. 2018).  In addition, "the moving party bears the initial burden of showing that there is no genuine dispute of material fact."  *Ask Chems., LP v. Comput. Packages, Inc.*, 593 F. App'x 506, 508 (6th Cir. 2014).  The moving party may satisfy this initial burden by "identifying those parts of the record which demonstrate the absence of any genuine issue of material fact."  *Lindsey v. Whirlpool Corp.*, 295 F. App'x 758, 764 (6th Cir. 2008).  "[I]f the moving party seeks summary judgment on an issue for which it does not bear the burden of proof at trial," the moving party may also "meet its initial burden by showing that 'there is an absence of evidence to support the nonmoving party's case.'"  *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).  Once the moving party satisfies its burden, "the burden shifts to the non-moving party who must then point to evidence that demonstrates that there is a genuine dispute of material fact for trial."  *Ask Chems.*,

593 F. App'x at 508-09.  "[T]he nonmoving party may not simply rely on its pleading, but must 'produce evidence that results in a conflict of material fact to be solved by a jury.'"  *MISC Berhad v. Advanced Polymer Coatings, Inc.*, 101 F. Supp. 3d 731, 736 (N.D. Ohio 2015) (quoting *Cox*, 53 F.3d at 150).

## III.    Analysis

### A.    Count One: Negligence

In his Opposition, Hupp concedes that CSX's Motion for Summary Judgment is meritorious as to Count One, Hupp's negligence claim.  (Doc. No. 23, PageID# 185.)  Accordingly, the Court grants summary judgment to CSX as to Count One.  Count One is dismissed.

### B.    Count Two: LIA Violation

As regards Hupp's remaining claim, Hupp alleges that the locomotive he occupied at the time of his injury was unsafe to operate because it was not equipped with "fully operational and properly functioning thermostatic controls within the cab . . . . "  (Doc. No. 1, ¶ 16.)  Hupp alleges that, because the HVAC system did not have properly functioning controls, the windows of the locomotive cab "became steamed over with condensation and, therefore, the engineer and [Hupp] could not see through the windows," and the side window of the locomotive had to remain open.  (*Id.* at ¶ 17.)  Hupp alleges that because the window remained open, the BB was able to pass through the open side window and strike him in the temple, thus injuring him.  (*Id.* at ¶¶ 17-18.)  Hupp alleges that "[t]hese conditions resulted from parts and appurtenances on the locomotive that were not in proper condition and not safe to operate without unnecessary danger of personal injury" as required by the Locomotive Inspection Act (the "LIA"), 49 U.S.C. § 20701.  (*Id.* at ¶ 18.)

### 1.  Parties' Arguments

CSX argues that the Court should grant summary judgment in its favor because there is no causation between the locomotive's thermostatic controls and the firing of a BB gun by a third-party assailant.  (Doc. No. 19, PageID# 137.)  CSX argues that, even if the Court takes Hupp's allegations as true that the HVAC system lacked functioning controls,[1] there is still no connection between the thermostat controls and the firing of a BB gun because, first, the firing of the BB gun was an intervening and independent cause and, second, nothing about the thermostat made an intervening third party more or less likely to fire the BB gun.  (*Id.*)  CSX further argues that the thermostat is not an item of safety equipment, nor an essential feature of the train, and nothing about its functionality can be said to result in unnecessary peril to life or limb or create an unnecessary risk of personal injury.  (*Id.* at PageID# 138.)  Finally, CSX asserts that "there is nothing in the record that indicates the thermostatic controls were malfunctioning, and even plaintiff's own post-incident report did not mention the thermostat."  (*Id.*)

In his Opposition, Hupp argues that the summary judgment standard under the Federal Employers' Liability Act ("FELA") differs from the traditional concepts that govern motions for summary judgment, and he emphasizes that other courts have repeatedly observed that FELA cases should only be removed from a jury in the "rarest of circumstances."  (Doc. No. 23, PageID# 189.)  Hupp argues that CSX had a duty, pursuant to the LIA and § 229.45, to maintain the HVAC system in a safe condition and that there are genuine issues of material fact as to whether CSX breached that duty and whether the HVAC system on the locomotive functioned as intended.  (*Id.* at PageID# 193-94, 196.)  Hupp further argues that a reasonable jury could conclude that the failure of the air

---

[1] CSX disputes Hupp's claim that the "thermostatic controls did not properly regulate the temperature in the cab, necessitating the opening of a window to change the air temperature."  (Doc. No. 19, PageID# 137.)

conditioning to function as intended played a part in bringing about his injury. (*Id.* at PageID# 197.) Hupp argues that opening the window was "within the risk created by" the fact that the HVAC temperature could not be regulated and that, if the crew did not open the window, condensation would have accumulated on the windshield. (*Id.* at PageID# 198.) Hupp also argues that it is important to note that the side window is subject to glazing regulations set forth in 49 C.F.R. § 223, which are meant to "protect railroad employees and railroad passengers from injury as a result of objects striking the windows of locomotives, caboose and passenger cars." (*Id.*) Hupp argues that the purpose of these glazing requirements is defeated if the crew is forced to open the protective barrier due to a malfunctioning HVAC system. (*Id.*)

In its Reply, CSX argues that Hupp failed to identify an LIA defect, beyond "non-specific allegations," including that the HVAC controls did not work, that it was too cold with the AC on, and that the fan settings could result in condensation on the windshield. (Doc. No. 25, PageID# 273.) Further, CSX argues, even if the Court gave Hupp every benefit of the doubt that he identified a defect, Hupp's purported defect does not violate the LIA because it does not render the locomotive unsafe to operate without unnecessary danger of personal injury. (*Id.* at PageID# 274.) CSX argues that this purported defect also does not violate the Locomotive Safety Standards set forth at 49 C.F.R. §§ 229.7 and 229.45, which require that locomotives be in safe condition, and does not create unnecessary peril to life or limb. (*Id.*) CSX also reasserts its argument that there is no causal connection between the HVAC unit and Hupp being struck in the temple with a BB pellet by an unknown perpetrator. (*Id.* at PageID# 279.) CSX argues the "open window was entirely incidental to the random BB pellet being fired at the train." (*Id.*)

9

## 2.      Relevant Statutory and Regulatory Framework

The "prime purpose" of the FELA is to protect railroad employees.  *Urie v. Thompson*, 337 U.S. 163, 191 (1949).  The FELA creates a statutory cause of action allowing a railroad employee to recover for employer negligence that, "in whole or in part," caused an employee's injury.  45 U.S.C. § 51.

To "supplement" the FELA and to "facilitate[e] employee recover[y]," Congress enacted the Locomotive Inspection Act.[2]  *Urie*, 337 U.S. at 189; *see also Chapman v. Norfolk Southern Railway Co.*, 612 F. Supp. 3d 730, 734 (S.D. Ohio 2020).  The LIA provides in relevant part as follows:

> A railroad carrier may use or allow to be used a locomotive or tender on its railroad line only when the locomotive or tender and its parts and appurtenances—
>
> > (1) are in proper condition and safe to operate without unnecessary danger of personal injury;
> >
> > (2) have been inspected as required under this chapter and regulations prescribed by the Secretary of Transportation under this chapter; and
> >
> > (3) can withstand every test prescribed by the Secretary under this chapter.

49 U.S.C. § 20701.

Negligence is not the basis for liability under the LIA.  *Lilly v. Grand Trunk W.R.R. Co.*, 317 U.S. 481, 485 (1943).  Rather, the LIA imposes "an absolute and continuing duty" on railroads to maintain locomotives and their parts and appurtenances so that they are in proper condition and safe to operate.  *Id.*  "Absolute liability is imposed upon the employer when its employee presents proof of an unsafe locomotive component and injury which is proximately caused by the unsafe condition." *Chapman*, 612 F. Supp. 3d at 735 (quoting *Williams v. S. Pac. Transp. Co.*, 813 F. Supp. 1227, 1230

---

[2] The LIA was previously known as the Boiler Inspection Act ("BIA").

10

(S.D. Miss. 1992) (citing *Green v. River Terminal Ry. Co.*, 763 F.2d 805, 810 (6th Cir. 1985))). A violation of the LIA is negligence *per se* under the FELA. *Id.* (citing *Szekeres v. CSX Transp., Inc.*, 617 F.3d 424, 427 (6th Cir. 2010)). Thus, "railroads whose employees are injured as a result of violations of the [LIA] will incur strict liability under the FELA." *McGinn v. Burlington N. RR. Co.*, 102 F.3d 295, 298-99 (7th Cir. 1996). "A carrier may violate the . . . LIA by failing to comply with regulations issued by the Federal Railroad Administration ["FRA"], or violating the broad duty imposed 'on carriers to keep all parts and appurtenances of their locomotives in proper condition and safe to operate without unnecessary peril to life or limb.'" *Reed v. Norfolk Southern Ry. Co.*, 312 F. Supp. 2d 924, 926 (N.D. Ohio 2004) (quoting *Mosco v. Baltimore & Ohio R.R.*, 817 F.2d 1088, 1091 (4th Cir. 1987)).

Relevant to the instant Motion are certain FRA regulations, including 49 C.F.R. §§ 229.45 and 223. 49 C.F.R. § 229.45 provides:

> **All systems and components on a locomotive shall be free of conditions that endanger the safety of the crew, locomotive or train.** These conditions include: insecure attachment of components, including third rail shoes or beams, traction motors and motor gear cases, and fuel tanks; fuel, oil, water, steam, and other leaks and accumulations of oil on electrical equipment that create a personal injury hazard; improper functioning of components, including slack adjusters, pantograph operating cylinders, circuit breakers, contactors, relays, switches, and fuses; and cracks, breaks, excessive wear and other structural infirmities of components, including quill drives, axles, gears, pinions, pantograph shoes and horns, third rail beams, traction motor gear cases, and fuel tanks.

49 C.F.R. § 229.45 (emphasis added).

49 C.F.R. § 223, Safety Glazing Standards—Locomotives, Passenger Cars and Cabooses pertains generally to the regulations related to locomotive windows:

> This part provides minimum requirements for glazing materials in order to protect railroad employees and railroad passengers from injury as a result of objects striking the windows of locomotives, caboose and passenger cars.

11

49 C.F.R. § 223.1.   According to Appendix A to § 223, Certification of Glazing Materials, all locomotive windows are subject to the following test, among others:

> (11) The Test Specimen for glazing material that is intended for use only in sidefacing glazing locations shall be subjected to a Type II test regimen consisting of the following tests:

> (i) Ballistic Impact: A standard 22 caliber long rifle lead bullet of 40 grains in weight impacts at a minimum velocity of 960 feet per second. . . .

49 C.F.R. § 223, App. A(b)(11)(i).

### 3.      Causation under FELA

Courts look to FELA's causation standard when addressing an LIA claim.  *Szekeres v. CSX Transp., Inc.*, 731 F.3d 592, 599 (6th Cir. 2013).  Under the FELA, there is a significantly lower threshold to prove causation, though this does not mean LIA plaintiffs need make no showing of causation.  *Id.*

Under FELA, "a railroad 'caused or contributed to' a railroad worker's injury 'if [the railroad's] negligence played a part—**no matter how small**—in bringing about the injury.'"  *Id.* (quoting *CSX Transp., Inc. v. McBride*, 564 U.S. 685, 692 (2011)) (emphasis added).  A plaintiff's burden of proof for causation when alleging a claim pursuant to FELA proves much lighter than in ordinary negligence cases.  *Kernan v. American Dredging*, 355 U.S. 426, 438-39 (1958).  The "quantum of evidence sufficient to present a jury question of causation" under FELA is "less than it is in a common law tort action."  *Pierce v. Southern Pacific Trans. Co.*, 823 F.2d 1366, 1370 (9th Cir. 1987).  The U.S. Supreme Court has instructed that the jury should determine liability under FELA so long as the evidence justifies "with reason, the conclusion that employer negligence played any part, even the slightest, in producing the injury."  *Rogers v. Missouri Pacific R.R. Co.*, 352 U.S.

500, 507 (1957). A FELA plaintiff's evidence of causation need be no more than "plausible." *Id.* at 506. *See also, e.g., Hines v. Consolidated Rail Corp.*, 926 F.2d 262, 268 (3d Cir. 1991); *Gray v. Alabama Great S. R.R. Co.*, 960 F.3d 212, 216 (5th Cir. 2020) ("Under the FELA, awarding summary judgment to the defendant railroad is appropriate '[o]nly when there is a complete absence of probative facts' to support a jury verdict in the plaintiff's favor.") (quoting *Lavender v. Kurn*, 327 U.S. 645, 653 (1946)).

In *CSX v. McBride*, the U.S. Supreme Court emphasized that, for more than 50 years, courts have applied a "relaxed standard" of causation under FELA. *McBride*, 564 U.S. at 692. However, the Supreme Court "also clarified that certain 'far out 'but for' scenarios' will not, as a matter of law, support viable FELA claims." *Szekeres*, 731 F.3d at 599 (quoting *McBride*, 564 U.S. at 704)). The Supreme Court cited to *Nicholson v. Erie R. Co.* as one such example. *Id.* In *Nicholson*, the plaintiff worked in a shop within the defendant railroad's rail yards. *Nicholson v. Erie R.R. Co.*, 253 F.2d 939, 940 (2d Cir. 1958). The plaintiff was the only female employee in the shop and there was no women's toilet adjacent to her assigned work area so the plaintiff would typically use a women's facility on one of the defendant's rail cars. *Id.* On the day of her injury, she was excused early from work and went to use the women's toilet on one of the rail cars in the yard. *Id.* After exiting the rail car's women's toilet, the plaintiff was inadvertently struck by something carried by a passenger and suffered an injury. *Id.* The plaintiff sued the railroad, arguing that it was negligent for not providing her with a women's toilet and that she was injured as a result. *Id.* The appellate court disagreed and affirmed the lower court's dismissal for lack of causation, concluding that "the cause and effect here were too far removed from one another in space and time to satisfy" FELA's requirements. *Id.* at 941.

13

The Sixth Circuit addressed *McBride* and *Nicholson* in *Szekeres v. CSX*.  *Szekeres*, 731 F.3d at 598-601.  In *Szekeres*, the plaintiff worked as a brakeman for CSX.  *Id.* at 596.  The plaintiff was responsible for operating a railroad ground switch.  *Id.*  The area where the plaintiff worked was muddy and not covered with ballast (i.e., crushed rock).  *Id.*  On the day of his injury, the plaintiff needed to use the toilet, but chose not to use the toilet inside the locomotive because it was "dirty," "smelly," "filthy," and "unusable."  *Id.*  Instead, he decided to find a private outdoor location to use and proceeded to walk up a small incline away from the switch.  *Id.*  However, the plaintiff slipped and twisted his knee.  *Id.*  The plaintiff claimed he slipped on the incline due to the mud on his shoes from working on the switch without any ballast underfoot.  *Id.* at 601.  Initially, the district court granted summary judgment to CSX on the plaintiff's FELA and LIA claims.  *Id.* at 596 (citing *Szekeres*, 617 F.3d at 424).  However, the Sixth Circuit reversed the district court's summary judgment order and remanded the case back to the district court for a trial by jury.  *Id.*  Subsequently, a unanimous jury found that CSX had violated the LIA by not providing a sanitary bathroom facility and that the LIA violation partially caused the plaintiff's injuries.  *Id.*  Upon CSX's renewed motion for judgment as a matter of law, the district court concluded that there was no "meaningful distinction" between *Nicholson* and *Szekeres* and concluded that "there was not sufficient causation to assess liability" against CSX on the LIA claim.  *Id.* at 597.

The Sixth Circuit disagreed.  *Id.* at 600.  The appellate court "reject[ed] . . . the district court's oversimplification" of *Nicholson* and "its conclusion that the Supreme Court's endorsement of *Nicholson* dictates judgment as a matter of law" for CSX on the plaintiff's FELA claim. *Id.*  The court noted there were certain similarities between *Nicholson* and the case before it, including that both plaintiffs were railroad employees who lacked access to usable lavatories and were both injured as

14

the result of seeking to relieve themselves.  *Id.*  However, the Sixth Circuit noted three key material differences between the cases:

> First, in *Nicholson*, the plaintiff was off-duty when the incident occurred. In this case, Plaintiff was on the job when the incident occurred. Second, in *Nicholson*, the plaintiff was on defendant railroad property but was not working at her workplace when she was injured; rather, she was on a passenger locomotive for the purpose of using the women's lavatory. In this case, Plaintiff was on Defendant's property, engaged in the scope of his employment, and walking in an area one of Defendant's supervisors acknowledged was used by railworkers to relieve themselves. Third, in *Nicholson*, the direct cause of the plaintiff's injury was the result of a passenger striking her with something the passenger was carrying (i.e., the injury was proximately caused by the action of an intervening third-party). No intervening objects, actors or actions were involved in this case; Plaintiff was alone when he walked from the muddy area behind the Valley City switch and slipped and fell on the incline as it existed in its natural state. Therefore, taking the facts in a light most favorable to Plaintiff, as this court must do in analyzing a Rule 50(b) motion, Plaintiff fell on an incline due to mud that accumulated on his shoes while he worked in the area behind the Valley City switch.

*Id.*  Thus, the Sixth Circuit reversed the district court and concluded that the facts in *Szekeres* were distinguishable from *Nicholson* and did "not constitute the kind of "far out 'but for' scenario" discussed in *McBrid*e."  *Id.* at 600-01.

Conversely, in *Green v. River Terminal Railway Co.*, the Sixth Circuit upheld the district court's decision to direct a verdict in favor of the defendant railroad on the basis that a defective radio was not the proximate cause of the plaintiff's injuries after the plaintiff was attacked by a fellow railroad worker.  *Green*, 763 F.2d at 810.  In *Green*, the plaintiff-appellant argued that a defective radio inside a locomotive caused his injuries because (1) the engineer on duty could not radio to the managers in charge to have the assailant, a fellow railroad employee who was drunk and belligerent, replaced prior to the attack, and (2) the plaintiff would have used the radio to communicate with the rail yard manager, rather than walk across the yard to use the office telephone, and therefore would not have been attacked inside the railyard office.  *Id.*  The Sixth Circuit rejected the plaintiff's

15

causation argument, concluding that it was "entirely too speculative to conclude that Dawson's attack on Green was caused by the fact that the radio on the engine was inoperable. That Green went to the yard office to make a call rather than walking directly to his car alone as did brakemen Sizemore and Rubino made it no more or less likely that he would have been assaulted by Dawson." *Id.*

In *Richards v. Conrail*, the Sixth Circuit also briefly addressed hypothetical scenarios in which a locomotive's "defective appliance and the plaintiff's injuries become too attenuated to conclude that the defect caused the injury." *Richards v. Consolidated Rail Corp.*, 330 F.3d 428, 437 n.5 (6th Cir. 2003)  The court offered two examples in a footnote:

> Admittedly scenarios will arise where the connection between the defective appliance and the plaintiff's injuries become too attenuated to conclude that the defect caused the injury. Take for example the following scenario: a train goes into an emergency stop due to defective air brakes; and an employee, who has exited the train and is standing next to it merely waiting for the brakes to be repaired, is attacked by a rabid dog. Or the same employee waiting for the defect to be repaired decides to stretch his or her legs, goes for a walk, falls, and is injured. A court reasonably could find no causation as a matter of law in these situations.

> *Id.*

### 4.  Application

Upon careful consideration, the Court concludes that CSX's Motion as to Count Two should be denied.  The Court acknowledges this is a close question, but, viewing all facts and reasonable inferences therefrom in Hupp's favor, the Court concludes that Hupp's LIA claim should proceed for now.  *See Szekeres*, 617 F.3d at 430.  First, Hupp presented evidence that the HVAC system was defective and that the defect created an unnecessary danger of personal injury or unnecessary peril to life or limb.  According to Hupp's deposition testimony and subsequent affidavit, the cab's HVAC system over-cooled the cab, and the crew lacked the ability to control the temperature within the cab. (Doc. No. 23-2, PageID# 228-29; Doc. No. 23-3, ¶ 7.)  Moreover, Hupp averred that even though the

16

HVAC system was equipped with a fan, using the fan setting would cause condensation to form on the windshield and windows, obstructing the crew's view of the tracks from the cab.  (Doc. No. 23-3, ¶ 7.)  Hupp also averred that the cab's side window was open because the "only" remedy for this temperature versus condensation problem was to leave the window open.  (*Id.*)

Additionally, in Thomas's expert report in support of Hupp's Opposition, Thomas opines that, in his professional experience, there is a "possibility of window condensation from the cab being too cold," and that this "often happens in locomotives with older air conditioning units with little or no control over locomotive cab interior temperature."  (Doc. No. 23-4, PageID# 265.)  Thomas opined that the condensation requires the crew to constantly clear the windows to avoid an obstructed view or to open windows to adjust the cab's temperature, which is dangerous because constantly clearing the windows "takes the engineer's attention away from his job of running the locomotive safely and possibly missing crucial signals he needs to pay attention to operate the train safely."  (*Id.*)  Thomas further opined that the side windows of the locomotive, when properly glazed, are rendered bulletproof.  (*Id.* at PageID# 266.)  The Court concludes that Hupp's deposition and affidavit, along with Thomas's report, are sufficient to create a genuine issue of material fact as to whether the HVAC system was defective.  *See Szekeres*, 617 F.3d at 429 (the plaintiff's deposition testimony and affidavit were sufficient to create a genuine issue of material fact).

Although there is a genuine issue of material fact as to the existence of a defect in the HVAC system, the Court makes the following observations about the evidence in the record thus far.  First, Hupp's testimony about the potential cause of condensation on the windshield conflicts with Thomas's report.  Hupp avers that activating the HVAC system's fan would have caused condensation, but Thomas opines that the cold air itself can cause condensation.  (*Compare* Doc. No.

23-3, ¶ 7, *with* Doc. No. 23-4, PageID# 265.)  Thus, it is unclear how exactly the HVAC controls may or may not have made it more likely that condensation would obstruct the crew's view from inside the cab.  Second, CSX's counter-expert report introduces an inconsistency as to CSX's knowledge about, and inspection of, the HVAC system onboard the locomotive in question, BNSF 6769.  CSX asserts in its initial Motion that "there is nothing in the record that indicates the thermostatic controls were malfunctioning, and even plaintiff's own post-incident report did not mention the thermostat."  (Doc. No. 19, PageID# 138.)  Hupp's expert reported that "CSX has not indicated if the locomotive was inspected for proper AC operation post accident."  (Doc. No. 23-4, PageID# 265.)  However, according to Peterson's counter-expert report, in support of CSX's Reply, "BNSF maintenance records produced for BNSF 6769 indicate that **CSX informed BNSF on May 31 that the air conditioner was 'inoperative'** and that there was 'No Cooling' . . . ," and that BNSF's records indicate the locomotive's air conditioner was not addressed until August 2018.  (Doc. No. 25-1, PageID# 290, emphasis added.)  CSX does not explain how it came to learn that the air conditioner on Hupp's locomotive was "inoperative" the same day as Hupp's injury, or why CSX decided to check the status of the air conditioner after Hupp's accident, when, as CSX points out, Hupp's initial incident report did not even mention the HVAC controls.  (Doc. No. 19, PageID# 138.)  Still, at this juncture, there is at least some evidence in the record that the HVAC system was purportedly defective.

Moreover, there a genuine issue of material fact as to whether the purportedly defective HVAC system violated the LIA.  Hupp is clear in his affidavit that the *only* reason the side window was open was because the crew could not regulate the temperature in the cab *and* avoid condensation on the windshield without opening the side window.  (Doc. No. 23-3, ¶ 7.)  According to Thomas's

expert report, a locomotive's windows are bulletproof when they pass the testing contained in 49 C.F.R. § 223. The purpose of § 223 is to "protect railroad employees . . . from injury as a result of objects striking the windows of locomotives . . . ." 49 C.F.R. § 223.1.[3] Thus, the purportedly defective HVAC system put Hupp and Conti in a bind: they could either risk condensation forming on the train's windshield, potentially obstructing their view while driving a large freight train, or else open the side window to regulate the temperature and avoid condensation—but forgo the protection of the federally-mandated bullet proof window.

CSX's Reply argument that there was no indication the windows were not properly glazed misses the point. (Doc. No. 25, PageID# 278.) Indeed, Hupp's argument is premised on the assumption that the locomotive windows were properly glazed. Rather, Hupp argues that he would have been protected from the BB if he had not been forced to choose between risking condensation building up on the windshield or regulating the temperature by leaving the otherwise bulletproof window open. Moreover, contrary to Peterson's counter-expert report, there is no evidence that Hupp and Conti opened the side window simply to enjoy the breeze. (Doc. No. 25-1, PageID# 290.) Hupp's affidavit indicates that Conti only opened the side window to regulate the temperature while avoiding creating condensation buildup on the windshield. (Doc. No. 23-3, ¶ 7.) Accordingly, the Court concludes that a genuine issue of material fact exists as to whether the purportedly defective HVAC

---

[3] There are multiple cases involving third parties throwing, launching, and/or shooting projectiles at passing trains, and often causing great injury as a result. *See, e.g., Ill. Cent. R.R. Co. v. Brent*, 133 So.3d 760 (Miss. 2013) (railroad employee, who kept the cab's side windows open for ventilation, sustained shoulder injury after he was shot by a 14-year-old with a pellet rifle); *Weaver v. Missouri. Pac. R. Co.*, 152 F.3d 427 (5th Cir. 1998) (engineer injured when a third party threw a bottle through the cab's open side window and hit the engineer in the head); *Mosco v. Baltimore & Ohio R.R.*, 817 F.2d 1088 (4th Fir. 1987) (engineer injured when a rock, or similar object, was thrown through the cab's open side window and struck him in the head).

system required the crew to open the side window to regulate the temperature, thereby creating an unnecessary danger of personal injury or unnecessary peril to life or limb.

Finally, there is a genuine issue of material fact as to whether Hupp's injury was caused, even in the slightest part, by the purportedly defective HVAC system.  The Court is mindful that the FELA causation standard is relaxed and "as broad as could be framed."  *McBride*, 564 U.S. at 692 (quoting *Urie*, 337 U.S. at 181).  Hupp need only show that CSX's actions played "any part, *even the slightest*" in causing his injury.  *Id.* (quoting *Rogers*, 352 U.S. at 506) (emphasis added).  The Sixth Circuit has indicated that "if as a result of a defective appliance a plaintiff is required to take certain actions and he or she is injured while taking those actions, the issue of causation generally should be submitted to the jury."  *Szekeres*, 731 F.3d at 601 (quoting *Richards*, 330 F.3d at 437).  Moreover, the FELA indicates a strong preference against removing a case from the jury except in rare circumstances.  *Rogers*, 352 U.S. at 509.  *See also, e.g., Szekeres v. CSX Trans., Inc.*, 617 F.3d 424, 430 (6th Cir. 2010) (noting that, although it was a close question whether an unsanitary toilet facility caused the employee's knee injury when he fell after walking to relieve himself outside, the Sixth Circuit concluded the district court improperly granted summary judgment in the railroad's favor and that there was a sufficient factual basis for a reasonable jury to conclude that such an injury was within the risk created by the unsanitary toilet onboard the locomotive).  As discussed above, there is evidence that Conti *only* opened the side window because he was trying to regulate the freezing cold temperature in the cab without also causing condensation to obscure the locomotive's windshield. (*See* Doc. No. 23-4, ¶ 7.)  The BB pellet was only able to enter the cab and strike Hupp because the side window was open to address the climate control problem caused by the purportedly defective

HVAC system.  (*Id.*)  Although this is a "close question," *see Szekeres*, 610 F.3d at 430, the Court concludes that, at this stage, this is sufficient to defeat CSX's Motion.

CSX asserts that "[t]his is precisely the type of far out 'but for' scenario" the Supreme Court rejected in *McBride*, by way of the Supreme Court's citation to *Nicholson*.  (Doc. No. 25, PageID# 279.)  The Court disagrees.  The instant case does share one key similarity with *Nicholson*, specifically that both cases involve harm caused directly by an intervening third party.  *See Nicholson*, 253 F.2d at 941 (plaintiff was injured when a passenger inadvertently hit her while boarding the train).  However, in *Szekeres*, the Sixth Circuit identified two other "key facts" in *Nicholson*, namely that the *Nicholson* plaintiff was off-duty and was on railroad property, but not working at her workplace, at the time of her injury.  *Szekeres*, 731 F.3d at 600.  Conversely, here, an intervening third party directly injured Hupp, but while Hupp was on CSX's property, engaged in the scope of his employment for CSX, and the otherwise bulletproof side window was open, purportedly only to regulate the temperature in the cab.  Thus, the instant case is not entirely analogous to *Nicholson*.

CSX also compares the instant case to *Green v. River Terminal Ry. Co*.  (Doc. No. 25, PageID# 279-80.)  CSX argues that, as in *Green*, Hupp's LIA claim should fail because there is no causal connection between the purportedly defective device and an intervening third party's attack.  (*Id.; see also* Doc. No. 19, PageID# 137.)  However, *Green* is also distinguishable from the instant case.  First, in *Green*, the case proceeded past the summary judgment stage to trial and, after both parties presented evidence, the district court directed a verdict in favor of the railroad.  *Green*, 763 F.2d at 806.  Thus, even though the defendant railroad ultimately prevailed on its causation argument, the plaintiff's LIA claim still proceeded past the summary judgment stage.  *Id.*  Second, the *Green* court concluded that it was "entirely too speculative" to conclude that an intoxicated employee's

attack on the plaintiff "was caused by the fact that the radio on the engine was inoperable" because there was no connection between the broken radio and the intoxicated employee's attack.  *Id.* at 810. However, it is not "entirely too speculative" that a railroad worker could be injured by a projectile entering the cab through an open side window.  As discussed above, the FRA's regulations explicitly recognize, and attempt to protect railroad employees from, the possibility of "injury as a result of objects striking the windows of locomotives . . . ."  49 C.F.R. § 223.1.  Likewise, this case is distinguishable from the Sixth Circuit's example of a rabid dog attack in *Richards v. Conrail*.  *See Richards*, 330 F.3d at 437 n.5.  The connection between an open window and a projectile entering the cab is not as attenuated as a random attack by a rabid dog.  Instead, the FRA plainly contemplated, and attempted to mitigate, the risk of projectiles entering trains through windows and injuring railroad workers through its regulations.  The instant matter is also distinguishable from the Sixth Circuit's example of an employee who, while waiting for a defect to be repaired, decides to stretch his or her legs, goes for a walk, falls, and is injured.  (*Id.*)  In this example, the employee is not at his workstation or even on the property of the railroad employer but rather on a personal jaunt or lark, whereas Hupp was working for CSX, and positioned as the conductor on, and operating CSX's train.

Thus, at this juncture, the Court disagrees with CSX that it was "entirely too speculative" that Hupp could be injured by a projectile entering the cab when the crew was purportedly forced to leave the otherwise bulletproof window open to regulate the cab temperature.  Viewing the facts and related reasonable inferences therefrom in a light most favorable to Hupp, the Court concludes there is a direct tie between purportedly defective HVAC system and Hupp's injury.  Accordingly, CSX's Motion as to Count Two is denied.

**IV.    Conclusion**

For the foregoing reasons, CSX's Motion for Summary Judgment (Doc. No. 19) is GRANTED IN PART and DENIED IN PART.

**IT IS SO ORDERED.**

                                 *s/Pamela A. Barker*
                                 PAMELA A. BARKER
Date:  May 31, 2023                 U. S. DISTRICT JUDGE